James Hochberg
Hawaii Bar No. 3686
JAMES HOCHBERG AAL, LLLC
700 Bishop Street, Suite 2100
Honolulu, HI  96813
Telephone: (808) 256-7382
jim@jameshochberglaw.com

John C. Sullivan*
Texas Bar No. 24083920
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Counsel for Plaintiffs
* *Pro hac vice* motion forthcoming

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RIKI O'HAILPIN, NINA ARIZUMI, ROBERT ESPINOSA, ERWIN YOUNG, PUANANI BADIANG, SABRINA FRANKS, and RONALD LUM<br><br>on their own behalf and on behalf of all   others similarly situated,<br><br><br><br><br>*Plaintiffs,*<br>v.<br><br>HAWAIIAN   AIRLINES,   INC.,   and HAWAIIAN HOLDINGS, INC. | Civil No.: _____<br><br>CLASS ACTION VERIFIED COMPLAINT; DECLARATIONS (Riki O'Hailpin, Nina Arizumi, Robert Espinosa, Erwin Young, Puanani Badiang, Sabrina Franks, and Ronald Lum)<br><br>Jury Trial Demanded |

*Defendant.*

## CLASS ACTION VERIFIED COMPLAINT

1.     Plaintiffs Riki O'Hailpin, Nina Arizumi, Robert Espinosa, Erwin Young, Puanani Badiang, Sabrina Franks, and Ronald Lum (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, complain as follows against Defendants Hawaiian Airlines, Inc. and Hawaiian Holdings, Inc. (collectively, "Hawaiian").

2.     This is a class action brought to remedy Hawaiian's pattern of discrimination against employees who requested religious and/or medical accommodations from Hawaiian's mandate that its employees receive one of the COVID-19 vaccines.

3.     Rather than complying with its obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"), Hawaiian responded by issuing blanket denials of requests for accommodation, often failing entirely to address what the employee had stated in their request.  Moreover, throughout the process Hawaiian issued conflicting statements about how it viewed certain religious beliefs.  The one constant was that Hawaiian chose to deny virtually every request for an accommodation.  Hawaiian's almost 100% denial rate shows a system rigged against employees entitled to protection under federal law.  Now those

employees are set to be either terminated or placed on unpaid leave pending termination in one year.

4.    To be sure, the company eventually shifted its focus to a "safety" rationale that supposedly cannot be set aside because of the hardship it could cause Hawaiian.  Hawaiian implemented a flawed testing program that was hard on both sides—a fact it now claims proves that no testing accommodation is reasonable. That is not how Title VII and the ADA work.

5.    While no one doubts the seriousness of the pandemic, safety concerns do not relieve Hawaiian of its duties under Title VII and the ADA.  Setting aside the fact that forced vaccinations do not prevent employees from spreading COVID-19, unvaccinated employees who do not have the virus certainly cannot spread it, and therefore testing is the safest option—and there are many costless ways that Hawaiian could implement that accommodation.  Moreover, Hawaiian is already allowing countless unvaccinated individuals to fly on its planes each day—a correct policy since it is virtually impossible to catch COVID on an airplane.  While Hawaiian is allowed to make COVID-19 vaccination a condition of employment (with reasonable accommodation permitted), it may not use safety as a pretextual basis for violating federal law.

6.    Most importantly, discriminating against employees entitled to an exemption under Title VII or the ADA is improper (and illegal) when the costs of

accommodating them safely is nothing more than a *de minimus* burden, at most.  As seen with countless companies across the Nation—including every major airline—reasonable (free) accommodations are readily available to Hawaiian and could be implemented without undue hardship.  Under federal law, then, Hawaiian does not get a choice on whether to accommodate its employees.

7.     Instead, Hawaiian seeks to impose onto Plaintiffs the choice of either taking the COVID-19 vaccine—at the expense of their religious beliefs and/or their health—or losing their livelihoods.  This decision haunts not just the Plaintiffs but others similarly situated who must consider daily if they are doing the right thing or should just take the vaccine to provide for their families.  Through its actions, Hawaiian has violated Title VII and the ADA by failing to engage in the interactive process, failing to provide reasonable accommodations, and also by retaliating against employees who engaged in protected activity.  This violation is ongoing and must be stopped.

## PARTIES

8.     Plaintiff Riki O'Hailpin is a Flight Attendant with Hawaiian based out of Honolulu.  Ms. O'Hailpin requested a religious accommodation from Hawaiian's vaccine mandate, but Hawaiian denied that request, calling her sincere religious beliefs merely a "personal preference."   Ms. O'Hailpin also requested a medical accommodation based on her doctors' recommendations that she not get the vaccine

due to her antiphospholipid syndrome that affects her reproductive system. Hawaiian, however, made the medical determination that Ms. O'Hailpin's condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well. Hawaiian's actions have harmed Ms. O'Hailpin and, unless abated, will continue to harm her irreparably.

9.     Plaintiff Nina Arizumi is a Flight Attendant with Hawaiian based out of Honolulu. Ms. Arizumi requested a religious accommodation from Hawaiian's vaccine mandate, but Hawaiian denied that request, calling her sincere religious beliefs (a sect of Shintoism) merely a "personal preference." Ms. Arizumi also requested a medical accommodation based on her doctor's recommendation that she not get the vaccine because of her mitral valve prolapse. Again, Hawaiian made the medical determination that Ms. Arizumi's condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well. Hawaiian's actions have harmed Ms. Arizumi and, unless abated, will continue to harm her irreparably.

10.     Plaintiff Robert Espinosa is a First Officer with Hawaiian based out of Honolulu and a teaching pastor at his local church in Makakilo. Mr. Espinosa requested a religious exemption from the mandate because his sincerely held religious beliefs concerning the sanctity of human life conflict with the vaccines' undisputed connections to the stem cell lines of aborted fetuses. Evidently failing to

read his submission, Hawaiian denied Mr. Espinosa's exemption because it was just—in Hawaiian's words—a "personal preference . . . couched against the context of [his] religious beliefs [and was] not a sincere religious objection in actual conflict with [Hawaiian's] vaccine requirement."  Hawaiian's actions have harmed Mr. Espinosa and, unless abated, will continue to harm him irreparably.

11.     Plaintiff Erwin Young is a Lead Aircraft Technician with Hawaiian at the Daniel K. Inouye International Airport in Honolulu.  Mr. Young requested a religious accommodation from Hawaiian's vaccine mandate based on a straightforward statement that his body is the temple of the Holy Spirit and that he could not contaminate it with the vaccine.  After interviewing Mr. Young to see if he could be dissuaded from his sincerely held religious beliefs, Hawaiian responded to his request with a denial based on alleged "undue hardship."  While the company acknowledged Mr. Young's sincere religious beliefs, Hawaiian claimed that it could not safely accommodate him in any way—even though he has worked safely during the pandemic for almost two years wearing a mask and following other company guidelines.  Hawaiian's actions have harmed Mr. Young and, unless abated, will continue to harm him irreparably.

12.     Plaintiff Puanani Badiang is a Management Instructor for the Corporate Offices of Hawaiian in Honolulu.  Ms. Badiang requested an accommodation from Hawaiian's vaccine mandate based on her sincerely held religious beliefs related to

the vaccines' connections to abortions.   Ms. Badiang was interviewed by representatives of Hawaiian to see what others at her church (including her pastor) thought about the vaccine and to see if she could be talked out of her religious beliefs. When she attempted to raise possible accommodations in an effort to engage the interactive process, she was told that it was not up to the interviewers and that they could not provide her with any solutions.   Hawaiian denied Ms. Badiang's request based on alleged "undue hardship."   While the company acknowledged her sincere religious beliefs, it claimed that she could not be safely accommodated in any way— even though she has taught classes remotely throughout the pandemic and implemented social distancing for her in-person classes before it was required by the company.   Hawaiian's actions have harmed Ms. Badiang and, unless abated, will continue to harm her irreparably.

13.   Plaintiff Sabrina Franks is a Customer Service Agent for Hawaiian from Mililani.  Ms. Franks requested a religious accommodation from Hawaiian's vaccine mandate based on her desire to honor God's direction against taking it. Hawaiian denied that request based on alleged "undue hardship."   The company acknowledged Ms. Franks' sincere religious belief but claimed that she could not be safely accommodated in any way.  This was evidently so, even though Ms. Franks previously worked during the pandemic in the Hawaiian lounges—behind plexiglass while wearing a mask, face shield, and gloves—where her only interaction with

others consisted of checking credentials and swiping membership cards for lounge entry using a small opening in the plexiglass.  Hawaiian's actions have harmed Ms. Franks and, unless abated, will continue to harm her irreparably.

14.     Plaintiff Ron Lum is a Captain with Hawaiian based out of Honolulu. Mr. Lum requested a religious accommodation centered on the belief that his body is a temple of the Holy Spirit and that, given specific Scriptural commands found in the Bible, it should not be altered with an unwanted intrusion.  To deny that request, Hawaiian combined both the personal preference rationale and the undue hardship excuse.  Mr. Lum was informed that he will be subject to termination if he does not upload his vaccination card by January 4, 2022.  Mr. Lum also submitted a request for a medical accommodation based on his doctor's recommendation that he not get the vaccine because of his coronary artery disease and the unnecessary risk of cardiac inflammation that the vaccine would cause.  Hawaiian made the medical determination, however, that his condition did not require an exemption from the COVID-19 vaccine mandate and denied that request as well.  Hawaiian's actions have harmed Mr. Lum and, unless abated, will continue to harm him irreparably.

15.     Defendant Hawaiian Airlines, Inc. is a Delaware corporation with its principal place of business in Honolulu, Hawaii.  The airline's main hub is the Daniel K. Inouye International Airport on the island of O'ahu and the company maintains a

large workforce there.  Hawaiian's headquarters are also located within this judicial district.

16.    Hawaiian Holdings, Inc. is a Delaware corporation and the parent company of Hawaiian Airlines, Inc.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

18.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; class certification will be requested pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b).

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Hawaiian resides in this District and because a substantial part of the events complained of herein occurred in this District and Division.

20.    This case challenges Hawaiian's decision to implement a COVID-19 vaccine mandate without also granting reasonable accommodations as required under Title VII and the ADA.  Activities and occurrences related to the development of the mandate and the determination for how to respond to accommodation requests occurred in this District.

## FACTUAL ALLEGATIONS

### A.    The COVID-19 Pandemic and Response

21.    By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, spread rapidly around the world.

22.    Around this same time, Hawaiian began implementing certain mitigation procedures for its workforce, including several of the following requirements for its employees: wear Hawaiian-issued masks, gloves, and for some, eye protection; maintain distance from others; and participate in temperature checks. Hawaiian also began increasing the cleaning regimens of its aircraft—spraying cabins with an anti-viral spray between flights—and upgraded its HEPA filters to prevent the spread of COVID-19.

23.    Since that time, at least three separate COVID-19 vaccines have been developed and authorized for emergency use in the United States.

### B.    Hawaiian's Vaccine Mandate

24.    On August 9, 2021, Hawaiian CEO Peter Ingram announced that all employees would be required to receive a COVID-19 vaccine.  At that time, he

assured employees that exemptions would be allowed for religious or medical reasons and to contact the Leave Management office.

25.    On September 1, 2021, Mr. Ingram informed employees that there was still no official policy in place, but that reasonable accommodation forms were available online and would be due October 1, 2021.

26.    During that month, it became known around the company that Hawaiian intended to terminate employees who did not receive the vaccine, regardless of their request for a religious or medical accommodation.

27.    On September 17, 2021, Hawaiian published its vaccination policy. All employees would have to be vaccinated by January 30, 2022, or face termination. Hawaiian's mandate is absolute—there is no alternative for periodic testing, mask wearing, or social distancing, even for employees who have already had COVID-19, and still enjoy immunity from the disease. Employees must choose vaccination or termination.

28.    Alternatively, unvaccinated employees have the option to be placed on a one-year involuntary leave of absence and then terminated at the end of that period. All pay, health, and flight benefits would also be suspended during the leave of absence. The involuntary leave is not available to non-union workgroups.

29.    At that time, Hawaiian also said that it would offer a "testing" option during the months of November, December, and January for those who did not want

to take the vaccination but would like more time to consider their decision.  Hawaiian stated from the beginning, however, that the testing option would only be temporary.

30.    This absolute vaccine-or-termination program differs substantially from every other major airline carrier.  Delta Airlines, for example, allows any employees who do not wish to be vaccinated to test once a week at home and provide Delta with a notice that they are negative for COVID-19—an exemption is not even required.  Similarly, American Airlines and Southwest Airlines—after initially stating they would have a vaccination or termination policy—revised their policies to make clear that they would not be firing any employee who refused to get a vaccine.  Those employees continue to work with required masking and testing measures in place.

31.    Even United Airlines—currently fighting in federal court to keep unvaccinated pilots and flight attendants on unpaid leave—determined (albeit after being sued) that most of its employees with religious or medical exemptions could easily be accommodated with masks and self-testing.

32.    This policy from Hawaiian also differs substantially from the European Union's digital COVID-19 certificate, which considers the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19.  *See EU Digital COVID Certificate*, EUROPEAN

COMMISSION, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en .

33.     Finally, while Hawaiian's policy is in line with the "federal contractor mandate" that requires companies doing business with the United States government to require vaccination for its employees, that is of no use to Hawaiian's argument here.  Not only is the federal contractor mandate currently stayed, that mandate provides—as it must under federal law—religious and medical exemptions. Hawaiian cannot provide less than the regulation it has used to partially justify its policy.  Hawaiian's policy is also out of step with the federal government's OSHA regulations that require vaccines *or* testing for employees of large companies like Hawaiian.

34.     When Hawaiian announced its policy, the company allowed employees to request accommodations for religious and/or health reasons.  This is in line with federal law and Equal Employment Opportunity Commission ("EEOC") guidance on private employers issuing such mandates.  *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* §§ K.1 & K.2., EEOC (May 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws .

35.     According to Hawaiian, its vaccination mandate is aimed at increased safety.  As stated in each of its form letters denying religious and medical

exemptions, Hawaiian "believe[s] that it is [the company's] responsibility to mālama our 'ohana and community by requiring our team to be vaccinated."

36.     Yet Hawaiian does not require any passenger flying on its planes, or interacting with its staff, to be vaccinated—the same is true of its vendors.  Nor does the mandate apply to pilots from other airlines allowed to ride in the "jumpseat" of the aircraft (in the cockpit) with Hawaiian flight officers.  And at the same time, Hawaiian no longer ensures the "deep" cleaning of aircraft after each flight as it has previously during the pandemic.

37.     Allowing unvaccinated individuals to fly on Hawaiian planes is not a safety issue.  The statistics show that one's odds of catching COVID-19 on an airplane are virtually zero—with or without a vaccine.

38.     Hawaiian appears to ignore the science behind the vaccinations and COVID-19 transmission.  As the CDC recognized in August, COVID-19 vaccines work "with regard to severe illness and death—they prevent it.  But what they can't do anymore is prevent transmission."  Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).  And while this has been known for several months, the recent Omicron variant of COVID-19 appears to be even more transmissible without regard to whether someone is vaccinated or not.  Unfortunately, COVID-19 vaccines are not the "silver bullet" to mālama (protect) one's 'Ohana (family) because vaccines—unlike masks and testing—do

not ensure safety in the workplace.  While Hawaiian continues to insist in its form denial letters that the "widespread medical consensus" is that "vaccination against COVID-19 is *absolutely necessary*" for safety in the workplace, this claim cannot withstand even a gentle breeze.

39.     That is why the CDC has recommended for the past seven months that "air carriers consider implementing routine testing of crewmembers to minimize the likelihood of crewmembers working on aircraft while . . . infected with SARS-CoV-2."  Safety Alert for Operators (SAFO) 20009, U.S. Dep't of Transp., Fed. Aviation Admin. (May 25, 2021) (recognizing need for even fully vaccinated air travelers to be tested when traveling to the United States from a foreign country).  If safety is the goal, testing—not vaccines—is how you mālama your 'Ohana.

### C.     Federal law prohibits religious and disability discrimination and retaliation

40.     Title VII prohibits Hawaiian from discriminating against employees based on their religion.  This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

41.     In other words, it is "unlawful 'for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'"  *Opuku-Boateng v. State of Cal.,* 95 F.3d

1461, 1467 (9th Cir. 1996) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).

42.    Title VII also prohibits Hawaiian from retaliating against an employee for engaging in protected activity.  *See Pardi v. Kaiser Foundation Hospitals,* 389 F.3d 840, 850 (9th Cir. 2004).

43.    Similarly, under the ADA, Hawaiian may not "discriminate against a qualified individual on the basis of disability."  *Humphrey v. Memorial Hospitals Ass'n*, 238 F.3d 1128, 1133 (9th Cir. 2001).

44.    Such discrimination "includes an employer's '*not making reasonable accommodations* to the known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'"  *EEOC v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 396 (2002)).

45.    Additionally, the ADA makes it unlawful to retaliate against an employee for seeking an accommodation.  *See* 42 U.S.C. § 12203(a).

**D.    Hawaiian's reasonable accommodation process**

46.    Hawaiian offered forms for employees to seek reasonable accommodations from the COVID-19 vaccine requirement.  There were separate forms for religious requests and medical requests.

47.    The religious form consisted of two areas where the company sought information: (1) the employee's religious beliefs, observances, and practices, including information about when they embraced those beliefs and examples of when, where, and how they have adhered to them; and (2) how the employee's religious beliefs, practices, or observances conflict with receiving the COVID-19 vaccination.

48.    The medical form asked for three things: (1) the functions of the employee's job that they had problems performing; (2) why they had problems performing those functions; and (3) any proposed accommodation that would enable them to perform those functions.  This was especially confusing since employees were seeking medical exemptions from the *vaccine* requirement, not a *job* requirement—as the employees had already been performing the essential functions of their jobs, they did not need an accommodation from those functions.

49.    Employees were asked to submit these forms by October 1, 2021.

**E.    Hawaiian's initial response to accommodation requests**

50.    The initial wave of denials were issued in mid-October, approximately two weeks after the deadline for submissions.  The primary response from Hawaiian was that religious requests were being denied because the employee's

> generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is

premised on the distinction you have made between vaccinations you consider medically necessary and those you do not.  This is a personal preference and not a generally applicable religious opposition.

51.     This same response was given to virtually everyone denied at that time, even those who did not reference their body as a temple and those who provided extended religious explanations (beyond their body being a temple) for why they could not take the vaccine.

52.     The canned denial letters ended with the especially offensive summary: "While your personal preference is couched against the context of your religious beliefs it itself is not a sincere religious objection in actual conflict with our vaccine requirement.  We have therefore denied your request."  Although the EEOC instructs employers to assume that religious beliefs are sincere, Hawaiian did not follow that rule.     EEOC   Guidance   Section   12:   Religious   Discrimination,   Part   A.3, https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination .

53.     Denials at this time were issued without any interactive process taking place.  Employees were not asked questions about their beliefs and, almost without exception, were not even asked to clarify anything.  As seen with Plaintiffs here, Hawaiian assumed insincerity on the part of the requesters and did so without even asking them any questions.

54.     The denied-employees were told they must either enroll in the testing program that Hawaiian had planned to run during November, December, and January, or that they would be terminated on November 1, 2021.

55.     The testing option had been set to expire on January 30, 2022, after which any unvaccinated employee could choose termination or a one-year leave of absence followed by termination if still unvaccinated.  The implementation of the "federal contractor mandate" in the meantime led Hawaiian to indicate that the testing program would end on December 8, 2021—the date the federal mandate was to take effect.

### F.     The effect of federal regulations on Hawaiian's policy

56.     Around this time, the federal government began issuing COVID-19 vaccination regulations related to federal contractors and large employers, both of which could cover Hawaiian.

57.     The "federal contractor mandate" is an executive order from the President requiring all federal contractors to enforce a 100% vaccination policy. While provisions were made for religious and medical exemptions, these companies would not be allowed to offer a general testing option for everyone.  *See* Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, 2021 WL 4148112 (Sept. 9, 2021).

58.     The federal contractor mandate was subsequently stayed in federal court and continues to be litigated.  *See Georgia v. Biden*, --- F.Supp.3d ---, 2021 WL 5779939, at \*12 (S.D. Ga. Dec. 7, 2021).

59.     Hawaiian chose to proceed with its vaccination policy but altered the terms so that individuals had until January 4, 2022, to present proof of vaccination to the company.

60.     The "OSHA mandate" is a rule issued by the Occupational Safety and Health Administration requiring employers who have more than 100 employees to implement either a vaccine or testing requirement at their workplace.

61.     The OSHA mandate was initially stayed by the Fifth Circuit Court of Appeals, *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), and then that stay was overturned by a panel of the Sixth Circuit Court of Appeals after multiple cases in various circuits were consolidated through the MDL process.  *In re: MCP No. 165*, 2021 WL 5989357 (6th Cir. Dec. 17, 2021).  The case is currently before the Supreme Court and arguments will be heard on the stay applications on January 7, 2022.  *NFIB v. OSHA*, Case No. 21A244.

62.     While Hawaiian has stated that it is following the federal contractor mandate, it has not indicated that it is following the OSHA regulations (which allow testing as an option).

## G.     The second wave of denials

63.     During the month of November, Hawaiian appears to have primarily focused on denying medical accommodation requests.

64.     Prior to these denials, Hawaiian asked for physicians to fill out forms for their patients and explain why they were recommending the employees not receive a vaccine.  No conversations took place as to reasonable accommodations since all requests were to be denied.

65.     Despite multiple letters from doctors indicating why their patients should not receive the COVID-19 vaccination, Hawaiian determined that each requester should still receive the vaccination because "the information [the employee] provided is not considered a contraindication to receiving a COVID-19 vaccination per the Centers for Disease Control and Prevention."

66.     Following the link to the website provided by Hawaiian, however, shows that the CDC's webpage was merely providing examples of known contraindications in the context of allergic reactions.  *See Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States: Contraindications and precautions*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html#Contraindications.  Those examples are applicable to the general population and were hardly intended to override specific physician diagnoses and

recommendations for individuals subject to disabilities.  Nevertheless, Hawaiian determined that it should substitute itself into the medical process and make those determinations on behalf of its employees.

### H.    The final wave of denials

67.    The final group of denials came during the month of December.  These letters followed a period during which Hawaiian interviewed some individuals who requested exemptions but did not contact others at all.

68.    The individuals with whom Hawaiian did engage in an "interactive" process were never asked what the company might be able to do in order to accommodate their exemptions.  Instead, the individuals were only asked questions related to the sincerity of their beliefs and whether there was anything Hawaiian could do to convince them to take the vaccine.

69.    While Hawaiian continued to deny individuals with form letters (including the "personal preference" version), most of the denials of religious exemptions at this time stated

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.

70.     The letters go on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

71.     The testing program to which Hawaiian refers in its blanket denial letters was the onerous process it developed to weed out individuals rather than work toward a long-term accommodation solution.  Employees were forced to pick up specific test kits (that were already expired) from select airport locations and to test even when they would not be working.  From the beginning, the program was only offered as a temporary solution to let employees decide whether they were going to take the vaccine or be terminated.

72.     Moreover, the program—designed by Hawaiian—was made unnecessarily complex and created confusion for many users.  For example, some "under the wing" employees initially tested on Thursdays, but the week before Thanksgiving the company suddenly changed that to Sundays.  That meant those employees had to test twice that week.  They were emailed on November 18, 2021, with the message that they had to test on November 18th and November 21st.  But since the email went to their work address, and not everyone was reading their work email, there was some company-created non-compliance during that time.

73.     Moreover, Hawaiian's testing program was also available to all unvaccinated Hawaiian employees, not just those seeking reasonable accommodations.   It is unclear what "the degree of non-compliance" was in Hawaiian's estimation and it is unclear which individuals were offenders in the company's estimation.   It does seem clear, though, that the program was meant to fail.

74.     Although Hawaiian makes vague reference to complexities, expense, and administrative burdens associated with its testing program, other airlines, hospitals, fire departments, etc. across the country have shown there are multiple ways in which to conduct a testing program that is both safe and no more than a *de minimus* burden on the company.  The fact that Hawaiian chose something allegedly more difficult for itself does not weigh against Plaintiffs here or absolve Hawaiian of its duties under federal law.

I.      **Plaintiffs' accommodation requests and responses**

**Riki O'Hailpin**

75.     Plaintiff Riki O'Hailpin is a Flight Attendant with Hawaiian, where she has worked for almost 24 years.

76.     As a Flight Attendant, Ms. O'Hailpin's responsibilities include explaining safety protocols, serving drinks and food, handling any emergencies that arise, and generally helping customers.

77.     Ms. O'Hailpin is also a member of Inspire Church on O'ahu and serves as one of the worship leaders for her congregation.

78.     On October 1, 2021, Ms. O'Hailpin submitted a request for a reasonable accommodation based on her sincerely held religious beliefs.  She explained that— her body was a temple of the Holy Spirit and that God had directed her not to take the vaccine as a result.  That belief was later strengthened when she learned that the COVID-19 vaccines were developed using aborted fetal tissue because she believes that it is sinful to use anything derived from abortion.

79.     Hawaiian did not engage in any interactive process with Ms. O'Hailpin or seek any additional information concerning her sincerely held religious beliefs.

80.     On October 13, 2021, she received a form letter matching the ones received by others denied at that time.  It stated that her request was denied

> because your generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not. This is a personal preference and not a generally applicable religious opposition.

81.     The letter went on state that what Ms. O'Hailpin had explained to Hawaiian was merely a "personal preference . . . couched against the context of [her] religious beliefs."

82.    On October 16, 2021, Ms. O'Hailpin submitted a request for a reasonable accommodation based on her medical disability.  She followed up on this request with a letter from her gynecologist on October 19, 2021, and an extended discussion of her condition from her reproductive endocrinologist on October 29, 2021.

83.    Ms. O'Hailpin suffers from antiphospholipid syndrome—a disease related to the autoimmune disease lupus.  It is a condition where a person's blood has extra proteins and thus makes the individual subject to thrombophilia or over-clotting.  Although Ms. O'Hailpin is not prevented from performing the essential functions of her job without an accommodation—*i.e.*, it does not stop her from being a Flight Attendant—the antiphospholipid syndrome is a physical impairment that substantially limits her reproductive system.  She has had four miscarriages because of the disease.  As it stands, whenever Ms. O'Hailpin gets pregnant—which she and her husband would like to do—she must take the injectable blood thinner Lovenox in an attempt to prevent her body from spontaneously aborting the fetus due to her antiphospholipid syndrome.  In light of this disability and the risk of the COVID-19 vaccine to cause blood clots, both of Ms. O'Hailpin's doctors indicated they would not administer the COVID-19 vaccination to her.

84.    If Hawaiian had engaged in a legitimate interactive process—as required by law—the company could have learned more about Ms. O'Hailpin's

situation and been able to provide her with a reasonable accommodation. She has not only abided by Hawaiian's mock testing program, she would be willing to do any other testing (or even take antibody tests) to ensure the safety of her coworkers, and to do so at her own affordable expense in order to continue working. Ms. O'Hailpin has already had COVID-19 and thus possesses the antibodies that a vaccine would seek to cause her body to produce artificially—an accommodation for her would be straightforward.

85.     If placed on unpaid leave, Ms. O'Hailpin will lose her travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

86.     Being terminated (or functionally terminated with forced leave) will impact Ms. O'Hailpin both personally and professionally. She will not only lose the career that she has spent almost 25 years building, she will also lose the 'Ohana she has come to know and love at her job. The prestigious 25th Anniversary celebration of her time at Hawaiian is just one example of what the company is costing her. No amount of backpay at the end of this lawsuit will be able to replace the comradery and the collaborations she has with her co-workers that the company is threatening to take away if Ms. O'Hailpin does not obey Hawaiian's dictate. Indeed, over the past month as she has informed co-workers of her pending leave/termination, many

have openly cried with her during flights as they learned that Hawaiian was going to sever these relationships.

87.    Ms. O'Hailpin will also miss opportunities to bid on job openings (aircraft, routes, leadership positions, etc.) that come up while she is out, as well as vacations and schedules that she might want in the future.

88.    The biggest irreparable harm for Ms. O'Hailpin will come as a direct effect of her loss of medical insurance.  After four miscarriages, IVF may be her last opportunity to get pregnant and it is not feasible to pay for it out of pocket; she must have her health insurance for it.  But given her age, this is the final year that insurance will pay for that treatment—the insurance that Hawaiian is now looking to take away.  In fact, Ms. O'Hailpin needs to begin her IVF cycle before April of 2022 when she turns 46 years old.  Moreover, the blood thinning medication that she must take while pregnant is also only available to her with her insurance coverage.  If Hawaiian takes this final opportunity away from Ms. O'Hailpin and her husband, there is no amount of money damages that could ever make her whole.

89.    Ms. O'Hailpin submitted separate inquiries to the EEOC regarding Hawaiian's discriminatory and retaliatory actions in October and November 2021, for the religious and medical denials.  Her most recent interview with the EEOC was on November 25, 2021, and the two inquiries are currently being consolidated into a single charge for her to sign.

**Nina Arizumi**

90.     Plaintiff Nina Arizumi is a Flight Attendant with Hawaiian, where she has worked for approximately 11 years.

91.     As a Flight Attendant, Ms. Arizumi's responsibilities include explaining safety protocols, serving drinks and food, handling any emergencies that arise, and generally helping customers.

92.     On September 29, 2021, Ms. Arizumi submitted a request for a reasonable accommodation based on her sincerely held religious beliefs.  She practices a specific sect of Shintoism that prevents her from taking vaccinations because they would impurify her body and permanently disable her spirit.  She is the leader of her sect that was founded by her great-grandfather in Japan more than 100 years ago.

93.     She received an email on October 14, 2021, denying her request for a religious exemption.  It stated that she was denied

> because your generalized belief that your body is a temple does not explain why you are sincerely and religiously opposed to receiving the COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus.  This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not.  This is a personal preference and not a generally applicable religious opposition.

94.     This was one of several canned denial letters that Hawaiian issued to its employees to deny religious exemptions.  This can be seen by its inapplicability to Ms. Arizumi's request.

95.     In her request, Ms. Arizumi did not talk about medical opinions but only sincere religious beliefs.  The fact that Hawaiian had not read her request was further highlighted by the fact that she never said that her "body is a temple."  Indeed, it is offensive to her religion to refer to the body as a temple in any way.  That is because temples are a part of the Buddhist religion, representing death and funerals; they are not part of the Shinto religion.

96.     Additionally, the letter from Hawaiian further downplayed the value of Ms. Arizumi's beliefs, stating that what she had explained to Hawaiian was merely a "personal preference . . . couched against the context of [her] religious beliefs."

97.     On September 30, 2021, Ms. Arizumi submitted a second request for a reasonable accommodation from the vaccine mandate—this one based on a medical disability.  She suffers from mitral valve prolapse and her doctor strongly recommended that she not get the COVID-19 vaccine.  Although Ms. Arizumi is not prevented from performing the essential functions of her job without an accommodation—*i.e.*, it does not stop her from being a Flight Attendant—the mitral valve prolapse is a physical impairment that substantially limits her circulatory system.  It causes shortness of breath and chest pain from time to time, and could be

fatal without the treatment of her doctor.  In light of this disability, Ms. Arizumi's doctor told her not to take the COVID-19 vaccination.

98.   Hawaiian followed up on this request by asking Ms. Arizumi's doctor to fill out additional forms.  He did so on November 1, 2021, indicating both Ms. Arizumi's documented history of mitral valve prolapse (that is also treated by a cardiologist) as well as a family history of arrhythmias, pericarditis, and other cardiac-related events.

99.   On November 4, 2021, Ms. Arizumi received an email denying her request for a medical exemption.  Hawaiian—substituting its medical judgments for that of Ms. Arizumi's doctor—informed her that the company was denying her request because "the information you provided is not considered a contraindication to receiving a COVID-19 vaccine."  However, a review of the CDC website on which Hawaiian is basing its medical decisions reveals that the CDC was referencing a non-exhaustive list of allergy contraindications—it does not purport to override either medical advice from a doctor or the ADA.

100.  If Hawaiian had engaged in a legitimate interactive process—as required by law—the company could have learned more about Ms. Arizumi's situation and been able to provide her with a reasonable accommodation.  She has not only abided by Hawaiian's mock testing program, but she would be willing to

do any other testing (or even take antibody tests) to ensure the safety of her coworkers, and to do so at her own affordable expense to continue working.

101.   If terminated, Ms. Arizumi will lose her travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

102.   Being terminated will impact Ms. Arizumi both personally and professionally.  She left a long-term job in pharmaceutical sales where she was the top performer in the United States to work at a job she really loves—being a Flight Attendant with Hawaiian.  Not only do Hawaiian's actions threaten that career, but she will lose the ability to travel with her husband and children using her flight benefits.   No amount of money later on will be able to replace the missed opportunities and memories with her children that she will miss out on once terminated.

103.   Hawaiian's illegal actions denying Ms. Arizumi a reasonable accommodation will also cost her what is known as "Princess Parking" at Hawaiian. While the title sounds trivial, the covered parking spot is extremely valuable since it is at the Terminal with a less than five-minute walk to work.  She received this premium parking spot during a once-in-a-lifetime lottery, and it saves her approximately one hour of commute time each day she is at work.  If terminated from Hawaiian, she will lose the ability to keep her premium parking spot after

January of 2022.  At the same time, the State has since determined that it wants those premium spots back.  But the State can only get them if an employee no longer works at the airport and must give up the spot for that reason.  Once Ms. Arizumi loses her Princess Parking spot, it goes to the government and cannot be returned.

104.   Above all, Hawaiian's refusal to provide reasonable accommodations for Ms. Arizumi creates an injury to her conscience.  Each day, she must decide if she is making the right choice in following her religious beliefs concerning her physical body or if she should be following her religious beliefs concerning taking care of her family.  And this is precisely what Hawaiian seeks to do: leverage employees' livelihoods into a 100% vaccination rate.

105.   Ms. Arizumi submitted an inquiry to the EEOC on October 15, 2021, regarding Hawaiian's discriminatory and retaliatory actions.  She had an interview with the EEOC on November 9, 2021, and signed her charge against the company on November 17, 2021.  Hawaiian has not yet responded to that complaint.

**<u>Robert Espinosa</u>**

106.   Plaintiff Robert Espinosa is a First Officer with Hawaiian, responsible for helping to pilot and command aircraft.  He has been with Hawaiian for 10 years and was previously with the Navy for 30 years.  He serves as a Master Executive Council member for Hawaiian's ALPA union, overseeing Veterans' Affairs.

107.   Mr. Espinosa is also an Elder and Teaching Pastor at his local church in Makakilo.

108.   On September 29, 2021, Mr. Espinosa submitted a request for a reasonable accommodation based on his sincerely held religious beliefs.  In his request, he explained that, as a follower of Christ and the Bible, he must take care of his body as a temple of the Holy Spirit.  The request showed that any of the COVID-19 vaccines would violate this belief for three reasons: (1) it would be ungrateful for God's blessing of natural immunity and a healthy immune system generally; (2) each of the vaccines uses or was tested on fetal stem cell lines, a desecration of the sacredness of life; and (3) through prayer and discernment, God had shown him that not everyone has been truthful about the vaccines and that he should have nothing to do with them as a result.  Each of these reasons was obviously religious and, as an ordained Pastor, Mr. Espinosa is committed not to do anything that violates the will of God or goes against His Word.  It would violate his conscience (and God's direct instruction) to take the vaccine.

109.   Without contacting Mr. Espinosa to engage in any sort of interactive process, and evidently without reading his submission, Hawaiian denied his request. He received the same form letter as others denied at that time, which stated that he was denied

> because your generalized belief that your body is a temple does not
> explain why you are sincerely and religiously opposed to receiving the

COVID-19 vaccine per se and relies to at least some extent on medical opinions at odds with the scientific consensus. This indicates that your belief is premised on the distinction you have made between vaccinations you consider medically necessary and those you do not. This is a personal preference and not a generally applicable religious opposition.

110. His denial letter went on to state that what Mr. Espinosa had explained to Hawaiian was merely a "personal preference . . . couched against the context of [his] religious beliefs."

111. If Hawaiian had engaged in an interactive process with Mr. Espinosa, the company could have learned more about his situation and recognized that he has a sincerely held religious belief that Title VII demands be honored. Moreover, multiple accommodations are readily available such as COVID-19 testing or testing for COVID-19 antibodies. Mr. Espinosa has not only abided by Hawaiian's mock testing program, but he would be willing to do any other form of testing at his own affordable expense to continue working safely. This is even more reasonable given the CDC's admission that vaccination does not prevent infection and transmission of COVID-19.

112. If placed on unpaid leave, Mr. Espinosa will lose his travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

113. Being placed on unpaid leave will affect Mr. Espinosa in other ways, too. Not only will he lose his income, he will also miss opportunities to bid on job

openings (aircraft, seat, routes) that come up while he is out.  His flight skills will also deteriorate as he becomes "non-qualified" to fly after 90 days without a take-off or landing.

114.   This mandate has already begun creating a tremendous strain on his wife and children as they know that taking the vaccine would violate his religious beliefs.  Yet, they are afraid he might do so to take care of them.

115.   Most importantly, Hawaiian is putting Mr. Espinosa to a daily religious test: refuse the vaccine to honor one set of religious beliefs and be denied his livelihood; or take the vaccine to honor the religious belief he holds of providing for his family.  This daily injury to his conscience is not something allowed under federal law and not something that can be paid back with money.

116.   Mr. Espinosa submitted an inquiry to the EEOC on December 21, 2021, regarding Hawaiian's discriminatory and retaliatory actions.

### Erwin Young

117.   Plaintiff Erwin Young is a Lead Aircraft Technician with Hawaiian. He has worked for the company for almost 10 years.

118.   In that position, Mr. Young is responsible for performing mechanic duties on Hawaiian's airplanes and leading a team that ensures the aircraft are ready to fly.

119.   On September 30, 2021, Plaintiff Young submitted a request for a religious accommodation.

120.   In his accommodation request, Mr. Young explained that—based on I Corinthians 6:19—his body is a temple of the Holy Spirit and that God had directed him not to take the vaccine as a result.  His belief was later strengthened when he learned that the COVID-19 vaccines were developed using aborted fetal tissue.  He believes it is sinful to use anything derived from abortion.

121.   Representatives from Hawaiian met with Mr. Young on November 5, 2021, to discuss his exemption request.  He was asked if anything could be done to encourage him to take the vaccine and if there was any specific ingredient that was preventing him from taking the vaccine.

122.   Possible reasonable accommodations were only discussed briefly at the very end of the meeting when he brought it up, but he was not provided with any answers and was told that no accommodations would be made.

123.   On December 16, 2021, Mr. Young's request for an accommodation was denied.  He was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.

124.   The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

125.   The notification was at odds with what had taken place during the pandemic, throughout which Mr. Young adhered to Hawaiian's COVID-19 policies without incident.  He has always worn a mask and socially distanced as required throughout the pandemic.  Hawaiian told Mr. Young (along with all of its employees) that they were safe to work during the pandemic with those measures in place.  Mr. Young also participated in Hawaiian's mock testing program throughout November and December without issue.

126.   If Hawaiian had engaged in a genuine interactive process with Mr. Young, the company would have realized that it could provide a reasonable accommodation such as affordable COVID-19 testing paid for by Mr. Young, antibody testing that would show the same protection (or better) than the vaccine now mandated by Hawaiian, or continuing to work with a mask and keep his co-workers safe in that manner.

127.   If placed on unpaid leave, Mr. Young will lose his travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing, company

matched retirement contributions, and loss of his only income source.  If placed on unpaid leave, Mr. Young will also be unable to afford his housing.

128.   Mr. Young submitted an inquiry to the EEOC on December 27, 2021, regarding Hawaiian's discriminatory and retaliatory actions.

**Puanani Badiang**

129.   Plaintiff Puanani Badiang is a Corporate Training Manager with Hawaiian.  She has worked for Hawaiian for 20 years in various capacities.

130.   In her current role, Ms. Badiang works primarily from home, training guest services workers for Hawaiian via Teams meetings online.  She occasionally teaches classes in-person at the Corporate Headquarters, where she strictly follows all mask and social distancing guidelines from the company.

131.   On September 28, 2021, Ms. Badiang submitted a religious accommodation request along with a letter from her Pastor explaining her views.

132.   As noted in the letter, Ms. Badiang—a devout Christian—cannot abide by any process that relates to or uses aborted cells.  This includes receiving vaccines that she believes were derived using aborted fetal tissue.  Ms. Badiang believes that receiving the vaccine is contrary to God's direct instructions for her life and it would violate her conscience to do so.

133.   Ms. Badiang was interviewed by a team from Hawaiian on November 1, 2021, concerning her request.  The meeting consisted of just a couple of questions

about what others at her church thought about the vaccine and if there was any way she could be persuaded to take the vaccine, either in its current form or a "new" version later.

134. She attempted to discuss possible reasonable accommodations with the interviewers—such as remote work, testing, antibody testing, etc.—but was just told that it was not something they could decide.

135. On December 14, 2021, Ms. Badiang received an email informing her that her request had been denied.  She was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.

136. The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

137. The notification was at odds with what had taken place during the pandemic, throughout which Ms. Badiang adhered to Hawaiian's COVID-19 policies without incident.  Not only did her classroom lead the way in safety—

implementing social distancing before required by Hawaiian—she also participated in Hawaiian's mock testing program without issue.

138.   Additionally, she would be willing to take COVID-19 or antibody tests to ensure the safety of her coworkers and to pay for any affordable testing out-of-pocket to continue working.

139.   If Hawaiian had engaged in a legitimate interactive process—as required by law—the company could have learned more about Ms. Badiang's situation and been able to provide her with a reasonable accommodation.

140.   Being terminated will impact Ms. Badiang both personally and professionally.  She will not only lose the career that she has spent 20 years building, she will also lose the 'Ohana she has come to know and love at her job.  The prestigious 25th Anniversary celebration of her time at Hawaiian is just one example of what the company is costing her.  No amount of backpay at the end of this lawsuit will be able to replace the comradery and the collaborations she has with her co-workers.

141.   Hawaiian's illegal actions denying Ms. Badiang a reasonable accommodation will also cost her what is known as "Princess Parking" at Hawaiian. While the title sounds trivial, the covered parking spot is extremely valuable since it is at the Terminal with a less than five-minute walk to work.  She received this premium parking spot through a once-in-a-lifetime lottery, and it saves her what

could be up to an hour of commute time each day she is at work.  If released from Hawaiian, she loses the ability to keep her premium parking spot after January of 2022.  And at the same time, the State has since determined that it wants those premium spots back.  But the State can only get them if an employee no longer works at the airport and has to give up the spot for that reason.  Once Ms. Badiang loses her Princess Parking spot, it goes to the government and cannot be returned.

142.   Ms. Badiang submitted an inquiry to the EEOC on December 22, 2021, regarding Hawaiian's discriminatory and retaliatory actions.

**Sabrina Franks**

143.   Plaintiff Sabrina Franks is a Customer Service Agent at Hawaiian and has been with the company for almost six years.  She handles check-in, baggage return, and works in the Hawaiian lounges at the Daniel K. International Airport in Honolulu.

144.   When working in the lounges, Ms. Franks verifies customer credentials and checks them in.  During the COVID-19 pandemic, plexiglass was placed in front of her check-in station in the lounges and she would take membership cards from customers through a small opening, swipe the card, and then return it to the customer.  Ms. Franks wore a mask, face shield, and gloves while doing this.  She has ensured customer safety at all times.

145.   On October 1, 2021, Ms. Franks submitted a request for a reasonable accommodation from the vaccine mandate based on her sincerely held religious beliefs.   As she explained in her submission, when it comes to what enters her body—which she views as the temple of the Holy Spirit—she prays and seeks counsel from God.  When she prayed about the COVID-19 vaccine, she did not feel released to take the vaccine and chose not to take it in order to honor God and what He has asked of her.

146.   This decision is not one Ms. Franks takes lightly.  Her parents and fiancé contracted COVID-19 during July of 2021 and were all hospitalized.  While her mother and fiancé recovered, her father did not.  He passed away on July 30, 2021, from COVID-19.

147.   Hawaiian arranged to have a meeting with Ms. Franks to discuss her request for a reasonable accommodation on October 20th.  During that meeting, she was asked if she had previously taken vaccines (she had not) and if any information could be provided about the COVID-19 vaccine that would cause her to change her mind or if she could be persuaded into taking the vaccine.  Possible reasonable accommodations were not discussed during the meeting.

148.   On December 13, 2021, Ms. Franks received an email informing her that her request had been denied.  She was told:

> Although you have a sincere religious belief, [Hawaiian] cannot reasonably accommodate you because it would cause an undue

hardship that will result in significant disruption to our operation. Based on our assessment of your position and duties in this current environment, we cannot safely accommodate you because your role does not allow for maintaining baseline COVID-19 safety protocols, specifically maintaining physical distance and mandatory masking.

149.   The letter went on to explain that the company has "also determined that we cannot accommodate you through testing [because] the complexity, expense, and administrative burden of managing the testing program is unsustainable.  This is particularly true because of the degree of non-compliance by a number of participants in the testing program . . . ."

150.   This letter was at odds with Ms. Franks' experience during the pandemic.  At all times she had worn a mask and maintained social distancing requirements—especially when working in the lounges behind plexiglass. Moreover, she participated in Hawaiian's mock testing program during November and December without any issue.

151.   Additionally, Ms. Franks is willing to pay for her own affordable COVID-19 or antibody testing to ensure that Hawaiian faces no burden in accommodating her.  Her only goal is to continue working.  If the company had engaged in an interactive process aimed at resolving her Title VII exemption rather than trying to talk her out of it, a reasonable accommodation would have been apparent.

44

152.   Hawaiian has said that Ms. Franks had until January 4, 2022, to provide proof of taking the COVID-19 vaccination or else be terminated.

153.   When Ms. Franks is terminated, she will lose her health insurance and flight benefits as well.

154.   All of this is causing incredible stress and mental anguish to Ms. Franks as she is forced daily to weigh her convictions against her livelihood.

155.   Ms. Franks also believes that Hawaiian is causing long-term damage to the relationships she and others have within the company.  An airline that has always taken pride in its "aloha" is doing daily irreparable damage to its workforce by pitting vaccinated employees against unvaccinated employees and by forcing individuals to violate their faith or lose their job.  This is not how normal families protect each other.

156.   Ms. Franks submitted an inquiry to the EEOC on December 20, 2021, regarding Hawaiian's discriminatory and retaliatory actions.

**<u>Ronald Lum</u>**

157.   Plaintiff Ronald Lum is a Captain with Hawaiian, responsible for piloting and commanding Boeing 717 aircraft.

158.   Mr. Lum worked throughout the duration of the pandemic, adhering to all regulations and policies without incident.  He has always worn a mask indoors,

participated in the testing program, and followed social distancing guidelines when applicable.

159.   As advertised by Hawaiian, Mr. Lum has always felt extremely safe flying during the pandemic given things such as HEPA filtration devices that clean the air (on the widebody craft) and the electrostatic fogging of the planes that Hawaiian was doing at one point (but has since stopped).  On the 717, the cabin air is constantly exchanged with outside air—after adjusting the temperature—to make sure it is free of viruses.

160.   On October 10, 2021, Mr. Lum submitted the first of two separate requests for a reasonable accommodation from the vaccine mandate—this one was based on a medical disability.  Mr. Lum suffers from coronary artery disease and his doctor recommended that he not get the COVID-19 vaccine.  While Mr. Lum can perform all of the essential functions of his job without an accommodation—*i.e.*, it does not prevent him from flying—the coronary artery disease is a physical impairment that substantially limits his circulatory system.  It must be treated with medicine and could be fatal without the care of a doctor.  In light of this disability, Mr. Lum's doctor told him not to take the COVID-19 vaccine.

161.  On December 7, 2021, Mr. Lum's request for a medical accommodation was denied.  In Hawaiian's words, "the information [he] provided is not considered a contraindication to receiving a COVID-19 vaccine."  The CDC

website, which the denial letter refers to, only references a non-exhaustive list of allergy contraindications—it does not purport to override either medical advice from a doctor or the ADA.

162. Mr. Lum also submitted a request for a religious exemption on October 25, 2021. As he stated, 1 Corinthians 6:19-20 teaches that his body is the temple of the Holy Spirit. Because he can care for his body, the temple, with the wisdom and convictions that God gives him, it is his sincere religious belief that it would dishonor God to take the vaccine.

163. On December 17, 2021, Hawaiian sent Mr. Lum a letter denying his religious exemption request. It stated first that the request merely "demonstrate[d] a personal preference" not to take the vaccine.

164. Had Hawaiian engaged in an interactive process with Mr. Lum, the company could have learned that he had scheduled vaccination appointments on multiple occasions but ended up canceling each time because he felt God telling him not to take the vaccine. He also has a girlfriend who is vaccinated and consistently asks him to get the vaccine. At the same time, he cares for his elderly mother and has been worried about transmitting COVID-19 to her. In other words, not taking the vaccine was already a difficult decision that Mr. Lum faced even prior to Hawaiian's mandate. To have not taken it at this point evidences a sincerely held religious belief.

165.   The denial letter went on to give the common explanation that Hawaiian would also be unable to accommodate Mr. Lum anyway because it would be an "undue hardship" for the company.

166.   Again, if Hawaiian had engaged in an interactive process with Mr. Lum, the company could have learned more about his situation and recognized that there would be no undue hardship in accommodating him.   Multiple accommodations are readily available such as COVID-19 testing or testing for COVID-19 antibodies.  Not only has Mr. Lum abided by Hawaiian's mock testing program during the past two months, he had regularly tested himself prior to the program to protect his elderly mother and girlfriend.  Additionally, Mr. Lum would be willing to do any other form of testing at his own affordable expense to continue working safely.  Any of these options are reasonable given the CDC's admission that vaccination does not prevent infection and transmission of COVID-19.

167.   If placed on unpaid leave or terminated, Mr. Lum will lose his travel benefits, medical, dental, and prescription drug coverage, as well as profit sharing and company matched retirement contributions.

168.   Being placed on unpaid leave or terminated will affect Mr. Lum in other ways, too.  Not only will he lose his income, he will also miss opportunities to bid on job openings (aircraft, seat, routes) that come up while he is out or vacation and

scheduling spots. His flight skills will also deteriorate as he becomes "non-qualified" to fly after 90 days without a take-off or landing.

169. Additionally, Mr. Lum will be unable to afford his residence in Honolulu and will be unable to pay for the rehabilitation program in which his elderly mother is currently participating.

170. Mr. Lum will also suffer one final irreparable injury at the hands of Hawaiian if he is forced into unpaid leave: he will miss his retirement flight in August. Pilots must stop flying commercially at age 65 with no exceptions. This means that a pilot's last flight before his 65th birthday is cause for quite the celebration—the pilot's family will often take the final trip with him or her and there may be water cannons shooting over the plane as the Captain pulls in to the gate for the last time. This moving ceremony is the capstone on a career in aviation that Hawaiian will deny Mr. Lum through its violation of federal law, and no amount of money will ever be able to repay that.

171. Mr. Lum submitted an inquiry to the EEOC on December 19, 2021, regarding Hawaiian's discriminatory and retaliatory actions.

## CLASS ALLEGATIONS

172.   Plaintiffs bring this class action under Federal Rules of Civil Procedure 23(a) and (b).

173.   Through this action, Plaintiffs seek to represent a class of all Hawaiian employees who requested accommodations from Hawaiian's vaccine mandate, who have had those accommodation requests denied, and are now faced with the decision of either taking a vaccine to which they object or suffering termination (either now or at the end of a one-year term of unpaid leave).

174.   Plaintiffs anticipate that they will ultimately seek three subclasses when they move for class certification: (1) employees who have sought either a religious or medical accommodation and previously recovered from COVID-19, possess antibodies against COVID-19, and are willing to produce periodic proof to Hawaiian showing that they remain antibody positive; (2) employees who sought religious accommodations, lack COVID-19 antibodies, and are willing to submit to mitigation measures such as periodic COVID-19 testing and/or wearing masks; and (3) employees who sought medical accommodations, lack COVID-19 antibodies, and are willing to submit to mitigation measures like periodic COVID-19 testing and/or wearing masks.   There may also be separate subclasses for employees who are "customer facing" and those who are "non-customer facing," depending on how Hawaiian proposes to accommodate its employees.

175.   By effectively treating all accommodation requesters the same, Hawaiian's actions are generally applicable to the entire class of Hawaiian employees for whom Hawaiian failed to grant reasonable accommodations.  With its virtually 100% denial rate through canned form letters that either did not address the actual issues at stake or, at the least, failed to demonstrate any undue hardship on Hawaiian, the company is liable for a pattern of discrimination.  Accordingly, the Court may grant relief to the entire affected class to prevent Hawaiian's continued violation of federal civil rights laws.

176.   Additionally, the class is so numerous that joinder of all members is impractical.  While the exact class size is unknown to Plaintiffs at this time, it is expected to exceed 300 employees.  The precise number and identification of the class members will be ascertainable from Hawaiian's records during discovery.

177.   There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

      a.    Did Hawaiian engage in a pattern or practice of discrimination with respect to employees seeking exemptions from the company's COVID-19 vaccine mandate?

      b.    Did Hawaiian comply with its obligations under federal law to engage in the interactive process when responding to accommodation requests with canned (and inaccurate) denial

letters following no meaningful dialogue as to what solution could be reached?

c.      Did Hawaiian comply with its obligations under federal law to reasonably accommodate employees with religious and/or medical objections to the vaccine mandate when it issued summary denials without demonstrating *any* hardship, let alone undue hardship?

d.      Did Hawaiian retaliate against employees who engaged in protected activity when it responded to each request by terminating (or functionally terminating) employment and by engaging in coercive conduct to dissuade employees from requesting (or continuing to seek) an accommodation?

178.   Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested accommodations from Hawaiian's vaccine mandate and Hawaiian denied those requests without engaging in any interactive process.

179.   For the same reason, Plaintiffs will fairly and adequately protect the interests of the class.

180.   The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class

action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. Joinder of all members is impracticable.

181. As explained above, Hawaiian has taken at least one relevant act that affects all members of the class. In addition, Hawaiian's act or acts will be felt by class members in this State and across the country. Each time a class member attempts to communicate with Hawaiian concerning their job status, they are reminded that they could just take the vaccine and keep their job.

## COUNT I
**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Religious discrimination—failure to accommodate**
**On behalf of Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang,**
**Franks, and Lum,**
**and others similarly situated**

182. Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

183. Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, and Lum hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

184. Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, and Lum informed Hawaiian of those beliefs and requested religious accommodations from the vaccine mandate.

185. Hawaiian refused to engage in the interactive process with Plaintiffs regarding their religious accommodation requests and, at best, only responded to

Plaintiffs with questions designed to deter Plaintiffs from exercising their religious beliefs.

186.   Irrespective of the interactive process, Hawaiian failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.  Termination (or unpaid leave for one year pending termination) is an adverse employment action.

187.   Hawaiian thereby discriminated against Plaintiffs because of their religious beliefs.

188.   Hawaiian's failure to provide religious accommodations has harmed and will continue to harm Plaintiffs.

189.   By failing to engage in the interactive process or offer any reasonable accommodation, Hawaiian's discriminatory actions were intentional and/or reckless and in violation of Title VII.

190.   Plaintiffs have filed inquiries and charges with the EEOC complaining of these discriminatory actions.  Although Plaintiffs' EEOC claims remain pending, this Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process. *See Duke v. Langdon*, 695 F.2d 1136, 1137 (9th Cir. 1983) ("The law of the circuit is that in a 'limited class of cases' a district court has jurisdiction to grant a preliminary injunction in a Title VII case before the completion of the administrative process in order to maintain the status quo." (citing *Berg v. Richmond Unified Sch.*

*Dist.*, 528 F.2d 1208, 1211 (9th Cir. 1975)); *Drew v. Liberty Mut. Ins. Co.*, 480 F.2d 69, 74 (5th Cir. 1973).

## COUNT II
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious discrimination—retaliation
### On behalf of Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, and Lum,
### and others similarly situated

191.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

192.   Plaintiffs O'Hailpin, Arizumi, Espinosa, Young, Badiang, Franks, and Lum engaged in protected activity when they requested religious accommodations from Hawaiian's vaccine mandate.

193.   Hawaiian responded by denying virtually every request for accommodation.   Although corporate officials stated that Hawaiian would not simply terminate (or otherwise force out of the company) those seeking exemptions, that turned out to be precisely what Hawaiian was planning on doing.

194.   Hawaiian's response to Plaintiffs' protected activity is an adverse employment action intended to force employees to forego their religious beliefs and receive the COVID-19 vaccine.   Indeed, for any employee the company engaged with on an individual basis, the only thing Hawaiian wanted to know was whether their belief was sincere and if there was anything the company could do to talk them out of it.   When its improper questioning of the employees' religious beliefs failed,

Hawaiian chose to retaliate by giving the employees the unlawful choice between vaccination and termination (or forced unpaid leave, the functional equivalent).

195.   Plaintiffs' religious beliefs and protected activity were the causes of Hawaiian's adverse employment action.

196.   By retaliating against Plaintiffs for engaging in protected activity, Hawaiian has violated Title VII.  This violation has harmed and continues to harm Plaintiffs.

197.   Plaintiffs have filed inquiries and charges with the EEOC complaining of these retaliatory actions.  This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process.  *See Duke*, 695 F.2d at 1137.

**COUNT III**
**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**Disability discrimination—failure to accommodate**
**On behalf of Plaintiffs O'Hailpin, Arizumi, and Lum,**
**and others similarly situated**

198.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

199.   Plaintiffs O'Hailpin, Arizumi, and Lum informed Hawaiian of their disabilities.

200.   Plaintiffs O'Hailpin, Arizumi, and Lum requested reasonable medical accommodations from Hawaiian's vaccine mandate for their disabilities.

201.   Hawaiian refused to engage in the interactive process with Plaintiffs regarding their medical accommodation requests.

202.   Hawaiian violated the ADA when it denied Plaintiffs' accommodation requests and offered them termination (or the functional equivalent of forced unpaid leave) instead.

203.   Hawaiian thereby discriminated against Plaintiffs because of their disabilities.

204.   Hawaiian's failure to provide medical accommodations has harmed and continues to harm Plaintiffs.

205.   By failing to engage in the interactive process or offer any reasonable accommodation, Hawaiian's discriminatory actions were intentional and/or reckless, and in violation of the ADA.

206.   Plaintiffs have filed inquiries and charges with the EEOC complaining of these discriminatory actions.  This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process.  *See Duke*, 695 F.2d at 1137; *see also Hilliard v. BellSouth Med. Assistance Plan*, 918 F. Supp. 1016, 1026 (S.D. Miss. 1995) "*Hilliard v. BellSouth Med. Assistance Plan*, 918 F. Supp. 1016 (S.D. Miss. 1995)" \s "Hilliard v. BellSouth Med. Assistance Plan, 918 F. Supp. 1016, 1026 (S.D. Miss. 1995)" (holding that a plaintiff may "proceed [on an ADA claim] without first

exhausting the EEOC's administrative process" where there is a showing of irreparable injury).

## COUNT IV
### Violation of the ADA, 42 U.S.C. § 12101, *et seq*.
### Disability discrimination—retaliation
### On behalf of Plaintiffs O'Hailpin, Arizumi, and Lum,
### and others similarly situated

207.   Plaintiffs restate the foregoing paragraphs as if set forth fully herein.

208.   Plaintiffs O'Hailpin, Arizumi, and Lum engaged in protected activity when they requested medical accommodations from Hawaiian's vaccine mandate.

209.   Hawaiian responded by taking an adverse employment action against each of them when it announced that it would terminate their employment for not receiving the vaccine (or force them into unpaid leave, the functional equivalent of termination).

210.   Hawaiian's response to Plaintiffs' protected activity is an adverse employment action intended to force employees to forego their medical reasons for not receiving the COVID-19 vaccine.

211.   Plaintiffs' medical disability and protected activity were the causes of Hawaiian's adverse employment action.

212.   By retaliating against Plaintiffs for engaging in protected activity, Hawaiian has violated the ADA.

213.   Plaintiffs have filed inquiries and charges with the EEOC complaining of these retaliatory actions.  This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process.  *See Duke*, 695 F.2d at 1137; *Hilliard*, 918 F. Supp. at 1026.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

a.     Certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b).

b.     Certify at least two subclasses: (1) employees who have sought either a religious or medical accommodation and previously recovered from COVID-19 and possess antibodies against COVID-19; (2) employees who sought either a religious or medical accommodation and lack COVID-19 antibodies.

c.     Declare that Hawaiian has violated Title VII and the ADA by failing to engage in the interactive process in response to requests for accommodations to its COVID-19 vaccine mandate.

d.     Declare that Hawaiian has violated Title VII and the ADA by discriminating against its employees by failing to provide reasonable accommodations to its COVID-19 vaccine mandate.

e.      Declare that Hawaiian has violated Title VII and the ADA by retaliating against employees who engaged in protected activity.

f.      Issue a temporary restraining order and/or preliminary injunction, *see Duke*, 695 F.2d at 1137, followed by a permanent injunction, enjoining Hawaiian from terminating, placing on unpaid leave, or forcing out of the company any employee who has a religious or medical basis for seeking an accommodation and does not wish to be terminated, placed on unpaid leave, or forced into retirement from the company.  Hawaiian should also be compelled to rehire anyone it attempts to terminate while the motion for a temporary restraining order and/or preliminary injunction are pending with this Court and to rehire anyone forced into retirement because of the company's unlawful discrimination.  The Court should enjoin such actions until Hawaiian has (1) completed the interactive process for all employees who requested such an accommodation and (2) granted reasonable accommodations as required by federal law—which could include: (i) for those who test positive for antibodies against COVID-19, allowing them to be accommodated through regular antibody testing and mask wearing; and (ii) for those with medical and/or religious accommodations, allowing them to attend work wearing a mask while around others and submitting to periodic COVID-19 testing.

g.       Award Plaintiffs, and those similarly situated, damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

h.       Award Plaintiffs reasonable attorneys' fees and costs.

i.        Grant any other relief that the Court deems just, proper, and equitable.

j.        Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

January 5, 2022                          Respectfully submitted,
                                         */s/ James Hochberg*
                                         James Hochberg, #3686
                                         JAMES HOCHBERG AAL, LLLC
                                         700 Bishop Street, Suite 2100
                                         Honolulu, HI  96813
                                         Telephone: (808) 256-7382
                                         jim@jameshochberglaw.com

                                         John C. Sullivan*
                                         Texas Bar No. 24083920
                                         S|L LAW PLLC
                                         610 Uptown Boulevard, Suite 2000
                                         Cedar Hill, TX  75104
                                         Telephone: (469) 523-1351
                                         Facsimile: (469) 613-0891
                                         john.sullivan@the-sl-lawfirm.com
                                         * *Pro hac vice* motion forthcoming

                                         *Counsel for Plaintiffs*
                                         RIKI O'HAILPIN, NINA ARIZUMI,
                                         ROBERT ESPINOSA, ERWIN YOUNG,
                                         PUANANI BADIANG, SABRINA
                                         FRANKS, and RONALD LUM on their
                                         own behalf and on behalf of all others
                                         similarly situated